529 So.2d 711 (1988)
Bernard SHAKTMAN, John J. DeBlasio, Alfred Mart, Robert Simon, Nick Satin, Lawrence Sokoloff, Lewis Allen Mart, Alan Scott Tabb, Milton Julius Shapiro, Sam Levanthal, Eli Lee Shapiro, Stuart Levanthal, Reuben Goldstein, Stanley Lawrence, Nicholas Sklaroff, and Lawrence Levine, Appellants,
v.
The STATE of Florida, Appellee.
Nos. 86-1527, 86-1528, 86-1534, 86-1680, 86-1792 and 86-2730.
District Court of Appeal of Florida, Third District.
March 29, 1988.
On Motion for Rehearing May 17, 1988.
*713 Mel Black, Miami, Alan I. Karten, Coral Gables, Martin Saxon, Miami, Alan E. Weinstein, Miami Beach, Harvey N. Shenberg, Miami, Nathaniel Barone, Jr., Coral Gables, for appellants.
Robert A. Butterworth, Atty. Gen., and Michele L. Crawford, Asst. Atty. Gen., for appellee.
Before DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ.
JORGENSON, Judge.
These are consolidated appeals by sixteen appellants from orders of the trial court denying their pretrial consolidated motions to suppress evidence derived from electronic surveillance and to dismiss the informations filed against them. For the reasons which follow, we affirm the trial court's orders denying the motions to suppress and the motions to dismiss the informations.
The appellants were charged with various offenses including violation of the Racketeer Influenced and Corrupt Organization statute [RICO], section 895.03, Florida Statutes (1983); RICO conspiracies in violation of section 895.03(3), Florida Statutes (1983); conspiracy to commit bookmaking; and bookmaking in violation of section 849.25, Florida Statutes (1983). The charges were the culmination of simultaneous investigations by the Miami Beach Police Department [Miami Beach] and the Metro-Dade Police Department [Metro-Dade] directed toward illegal gambling activities. The Miami Beach investigation was triggered by an informant's tip that Bernard Shaktman, who had prior bookmaking convictions, was involved in a bookmaking operation. Miami Beach commenced surveillance of Shaktman, and observed his close involvement with Alfred Mart who had prior arrests for bookmaking. Pen registers were installed on three telephone lines located in an apartment leased by Mart. The pen registers revealed a high level of telephone activity in the hours preceding the starting times of professional and collegiate sporting events. Calls were made from one of Mart's telephone numbers to a telephone number frequently used by John DeBlasio, the subject of a concurrent bookmaking investigation by Metro-Dade. DeBlasio's conversations had been intercepted by Metro-Dade through the wiretaps of two bookmaking suspects, Walter Kazakoff and Michael Elias. Because DeBlasio was implicated by both the Kazakoff and Elias wiretaps, Metro-Dade applied for and received authorization to wiretap DeBlasio's telephone. Miami Beach subsequently received authorization for a wiretap of Mart's telephones. At the conclusion of the investigation, the state filed informations against the sixteen *714 appellants for RICO and bookmaking offenses.
The appellants filed consolidated motions to suppress all evidence gathered from the pen registers and the wiretaps. The trial court held an evidentiary hearing and, in a written order, denied the motions. The trial court specifically found that sufficient probable cause had been demonstrated by the Mart and DeBlasio affidavits. The appellants then moved to dismiss the informations based upon a claim that the statute under which they were charged, section 849.25, Florida Statutes (1983), was unconstitutional. Following a hearing, the trial court denied the motions.
The appellants subsequently reached plea agreements with the State. Pursuant to the agreements, the appellants entered pleas of nolo contendere to reduced charges, reserving their right to appeal the trial court's orders denying their motions to suppress and to dismiss. The State and the appellants stipulated that the outcome of these appeals would be dispositive of the cause, i.e., that a favorable ruling for the appellants on either the motions to suppress or the motions to dismiss would terminate this prosecution.
The trial court held individual plea colloquies. Of the sixteen appellants in this consolidated appeal, only five  Alfred Mart, Reuben Goldstein, Stuart Levanthal, Bernard Shaktman, and John DeBlasio  entered nolo contendere pleas to felony charges pursuant to section 849.25. The remaining eleven appellants entered pleas of nolo contendere to the misdemeanor offense of gambling in violation of section 849.08, Florida Statutes (1983). Sentences ranging from non-reporting probation and a fine to four years' imprisonment were imposed.

I. CONSOLIDATED MOTIONS TO SUPPRESS

A. Pen Registers.
The appellants argue that the electronic surveillance evidence should have been suppressed as the product of an illegal warrantless search because the wiretaps of both the Mart and DeBlasio telephone lines were based primarily on pen register information obtained in violation of their rights to privacy as guaranteed by article I, sections 12 and 23, of the Florida Constitution. We find no merit in the appellants' arguments that the use of pen registers abridged their constitutional rights.[1]

1. Article I, Section 12.
The appellants concede that the use of pen registers does not abridge the fourth amendment to the United States Constitution because the Supreme Court has held that the utilization of a pen register to obtain numbers dialed from a telephone does not constitute a search or necessitate a warrant. Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). However, the appellants argue that the use of pen registers without a warrant subverts the broader scope of article I, section 12, of the Florida Constitution, which proscribes the "unreasonable interception of private communications by any means."[2] We reject this argument. Florida *715 courts, when construing the provisions of article I, section 12, are required by the plain language of section 12 to conform their decisions to follow fourth amendment analysis as set forth by the United States Supreme Court. The appellants' position that this court should afford section 12 a broader construction is, therefore, unavailing.
While other states have concluded that the use of a pen register without a warrant impermissibly intrudes into the privacy of individuals in violation of state constitutional provisions, e.g., People v. McKunes, 51 Cal. App.3d 487, 124 Cal. Rptr. 126 (1975); People v. Sporleder, 666 P.2d 135 (Colo. 1983) (en banc); State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982);[3]Commonwealth v. Beauford, 327 Pa.Super. 253, 475 A.2d 783 (1984), appeal dismissed, 508 Pa. 319, 496 A.2d 1143 (1985); State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986) (en banc), Florida courts have explicitly repudiated such a conclusion.[4]See Winfield v. Division of Pari-Mutuel Wagering, Dep't of Business Regulation, 477 So.2d 544 (Fla. 1985) (following United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), in holding that the subpoena by a state agency of a Florida citizen's bank records without notice does not offend privacy rights guaranteed by the Florida Constitution); Yarbrough v. State, 473 So.2d 766, 767 (Fla. 1st DCA 1985) (use of a pen register does not constitute a search or require a warrant under article I, section 12 of the Florida Constitution because Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), "delineates the parameters of the constitutional protection in Florida" regarding article I, section 12). We conclude that the use of a device which merely records the numbers dialed from a telephone does not amount to an unreasonable interception of a private communication prohibited by article I, section 12.

2. Article I, Section 23.
The appellants' alternative argument is that the right of privacy expressed in article I, section 23, of the Florida Constitution shields individuals from the type of intrusion presented by a pen register.[5],[6] Because we believe that this question is *716 one of first impression, we begin our analysis by ascertaining whether section 23 privacy interests are implicated by the use of pen registers.[7] Section 23 "expressly and succinctly provides for a strong right of privacy not found in the United States Constitution." Winfield, 477 So.2d at 548. It is "an independent, freestanding constitutional provision which declares the fundamental right to privacy." Id.
The section 23 privacy provision has been held operative in such disparate contexts as the denial of an AIDS victim's discovery request for the names and addresses of blood donors after he contracted AIDS following blood transfusions, Rasmussen v. South Florida Blood Serv., 500 So.2d 533 (Fla. 1987), and the right of an incompetent patient to have a feeding tube removed so as not to maintain life artificially, Corbett v. D'Alessandro, 487 So.2d 368 (Fla. 2d DCA), rev. denied, 492 So.2d 1331 (Fla. 1986). Conversely, the courts have failed to extend the constitutional right of privacy guarantee of section 23 to an individual's bank records subpoenaed by a state agency, Winfield, 477 So.2d 544 (Fla. 1985), a bar application's requirement for disclosure of psychological and medical treatment, Florida Bd. of Bar Examiners re: Applicant, 443 So.2d 71 (Fla. 1983), and to the criminalization of private possession of cannabis, Maisler v. State, 425 So.2d 107 (Fla. 1st DCA 1982), rev. denied, 434 So.2d 888 (Fla. 1983).
We find that the appellants' interests in the numbers dialed from the Mart telephones fall within the zone of privacy protected by section 23. Our reading of Rasmussen, 500 So.2d 533 (Fla. 1987), buttresses our determination that the warrantless use of pen registers in an ongoing criminal investigation involves the privacy safeguards ensured by section 23. In Rasmussen, the court observed:
The proceedings of the Constitution Revision Commission reveal that the right to informational privacy was a major concern of the amendment's drafters... . [A] principal aim of the constitutional provision is to afford individuals some protection against the increasing collection, retention, and use of information relating to all facets of an individual's life.
Id. at 536. Moreover, "[t]he drafters of the amendment rejected the use of the words `unreasonable' or `unwarranted' before the phrase `governmental intrusion' in order to make the privacy right as strong as possible." Winfield, 477 So.2d at 548. "The citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution." Id. See also Riley v. State, 511 So.2d 282, 288 (Fla. 1987) ("Our own right to privacy amendment, article I, section 23, Florida Constitution, was meant to protect against governmental encroachments on privacy made possible by increasingly sophisticated investigative techniques."), cert. granted, ___ U.S. ___, 108 S.Ct. 1011, 98 L.Ed.2d 977 (1988). The gathering of telephone numbers through the use of a pen register is, in our view, one of the sophisticated investigative techniques for collecting information which the drafters of the right of privacy amendment contemplated. In a noncriminal context, the use of a pen register on his telephone is precisely the type of activity which a private citizen would not expect from his government. We, therefore, conclude that section 23 clearly applies to the facts of the instant case.
Having determined that section 23 is applicable to these facts, we must, of necessity, address the interrelationship between section 12, the search and seizure provision, and section 23, the right of privacy provision. Both constitutional provisions may be implicated by a governmental intrusion *717 into a sphere of privacy.[8] "[I]ntrusions into privacy during criminal investigations are generally protected by the prohibition against unreasonable search and seizure." Rasmussen, 500 So.2d at 536 n. 1. But see Dore, Of Rights Lost and Gained, 6 Fla.St.U.L.Rev. 610, 650-57 (1978) ("[W]hile it generally was understood that search and seizure questions would not be affected by Proposal 123, the record reflects no intention to foreclose the possibility that they might be affected."). However, reviewing courts will be cautious not to eviscerate article I, section 12, by allowing section 23 to extend to all situations involving governmental intrusions. In State v. Hume, 512 So.2d 185 (Fla. 1987), the Florida supreme court held that the recording of conversations between a defendant and an undercover government agent in the defendant's home did not violate the fourth amendment of the United States Constitution, or article I, section 12, of the Florida Constitution. The court also observed that "our right-of-privacy provision, article I, section 23, of the Florida Constitution, does not modify the applicability of article I, section 12, particularly since the people adopted section 23 prior to the present section 12." Id. at 188.[9]See also Madsen v. State, 502 So.2d 948, 950 (Fla. 4th DCA 1987) (police officer's use of a body bug to intercept a defendant's communications connected with the sale of heroin consummated in the defendant's bedroom did not violate article I, section 23; if court were to apply the right of privacy in the manner recommended by the defendant, it "would effectively nullify the constitutional amendment to section 12, and this is obviously not an appropriate judicial prerogative."), aff'd, No. 70,327 (Fla. Jan. 28, 1988); Adams v. State, 436 So.2d 1132 (Fla. 5th DCA 1983) (audio and video recordings made in the course of a "sting operation" utilizing a storefront setting did not violate the defendant's right of privacy). Our conclusion that section 12 is not violated by the warrantless use of a pen register is not, however, dispositive of the question of a section 23 abridgement.
Because section 23 is involved when government agents obtain telephone numbers through the use of a pen register, we must gauge any claimed infringement according to the standard espoused by the Florida supreme court. Section 23 "was not intended to provide an absolute guarantee against all governmental intrusion into the private life of an individual." Florida Bd. of Bar Examiners, 443 So.2d at 74. We believe that the correct standard for assessing a claim of unconstitutional government intrusion under section 23 is the compelling state interest test established in Winfield, 443 So.2d at 74. According to Winfield, the test "shifts the burden of proof to the state to justify an intrusion on privacy." Id. If the state can demonstrate that the challenged government intrusion serves a compelling state interest and accomplishes its goal through the least intrusive means, then the state has met its burden and the right of privacy will yield. Id. In the instant case, the state has satisfied this standard. The state has a compelling interest in investigating and apprehending the principals of large-scale bookmaking operations. A pen register is one of the least intrusive methods *718 of obtaining information about such suspects. If the legislature had intended to require that search warrants accompany pen register use, it could easily have included pen registers in its list of definitions enumerated in section 934.02, Florida Statutes (1983). The absence of pen registers in section 934.02 supports the reasonable assumption that the type of privacy interest protected by chapter 934, covering Security of Communications, is not the same type of privacy interest addressed by article I, section 23.
It is a general principle of statutory construction that the mention of one thing implies the exclusion of another; expressio unius est exclusio alterius. Hence, where a statute enumerates the things on which it is to operate, or forbids certain things, it is ordinarily to be construed as excluding from its operation all those not expressly mentioned.
49 Fla.Jur.2d, Statutes § 126. See Thayer v. State, 335 So.2d 815 (Fla. 1976); Ocasio v. Bureau of Crimes Compensation Div. of Workers' Compensation, 408 So.2d 751 (Fla. 3d DCA 1982); Biddle v. State Beverage Dept., 187 So.2d 65 (Fla. 4th DCA), cert. dismissed, 194 So.2d 623 (Fla. 1966). We deem it significant that the ABA committee formulating the standards for electronic surveillance considered the issue and similarly rejected the inclusion of pen registers in the security of communications category.[10]
Our reading of the record in this case indicates that both Metro-Dade and Miami Beach fulfill the definition of "criminal justice agency" established by section 119.011(4), Florida Statutes (1983). The information gained from the law enforcement surveillances furnished abundant, founded suspicion justifying the installation of pen registers and satisfying the compelling state interest test. Therefore, the use of the pen registers by the law enforcement agencies, in support of the affidavits for the wiretap authorization, was proper. The information amassed from the pen registers was clearly "criminal investigative information" as defined in section 119.011(3)(b), Florida Statutes (1983).[11] Our conclusion that the compelling state interest test is satisfied by this record does not relieve law enforcement officers in future cases from establishing founded suspicion prior to the installation of a pen register.
Because the interrelationship between section 23 and the warrantless use of pen registers appears, as previously noted, to *719 be an issue of first impression since section 23 was passed, and consistent with the Florida supreme court's observation that "it is within the discretion of this Court to decide the latitude afforded article I, section 23," Winfield, 477 So.2d at 548, we certify the following questions to the Florida supreme court as being of great public importance:[12]
(1) WHETHER ARTICLE I, SECTION 23, OF THE FLORIDA CONSTITUTION IS IMPLICATED WHEN A LAW ENFORCEMENT AGENCY INSTALLS A PEN REGISTER DEVICE ON THE TELEPHONE OF AN INDIVIDUAL?
(2) IF THE ANSWER TO (1) IS YES, THEN IS THE COMPELLING STATE INTEREST TEST SATISFIED IF THE LAW ENFORCEMENT AGENCY INVOLVED IN THE INSTALLATION HAS FOUNDED SUSPICION AND MEETS THE CRITERIA ESTABLISHED BY SECTIONS 119.011(3)(a), (b), (c) AND 119.011(4)?

B. Probable Cause
The appellants allege that the Mart wiretap application was erroneously approved because the supporting affidavits failed to establish probable cause that actual betting activity was occurring over the telephones. In support of their argument, the appellants rely upon Murphy v. State, 402 So.2d 1265 (Fla. 3d DCA 1981). In Murphy, this court held that the affidavit filed in support of a wiretap application failed to establish probable cause that the defendant was using his telephone for a gambling operation where the information contained in the affidavit amounted only to a mere suspicion of gambling activity. Unlike the deficient affidavit in Murphy, the affidavits for the Mart wiretap meticulously detailed abundant evidence of illegal gambling activity. The Mart affidavits contained a description of the results of the police surveillance of Mart and his associates. A pattern of conduct consistent with bookmaking was manifested by Mart's routine in leaving his office during common bookmaking hours for the apartment where the telephones were located. Mart was observed exchanging manila envelopes with his associates.[13] The pen registers recorded the vast majority of incoming calls while Mart and Sam Levanthal were in the apartment. The pen registers also revealed that outgoing calls were made to known gamblers and bookmakers as well as to sports betting lines. The pen registers disclosed an impressive volume of telephone activity shortly before the start of major sporting events. The Mart affidavits further described numerous calls from the Mart lines to DeBlasio. Considering the totality of the circumstances, the Mart affidavits clearly established probable cause that the Mart telephones were being utilized for illegal bookmaking.
The appellants argue that the Mart wiretap was premature since the DeBlasio wiretap application by Metro-Dade had been approved on January 13, 1984, prior to the Mart wiretap application by Miami *720 Beach on January 17, 1984. The appellants claim that Miami Beach should have delayed the wiretap of Mart's telephones until the DeBlasio wiretap was executed by Metro-Dade. We are unaware of any requirement that one police department must await the results of an independent investigation by another law enforcement agency before seeking authorization for electronic surveillance. See, e.g., Sarno v. State, 424 So.2d 829, 831 (Fla. 3d DCA 1982) (where original affidavit was sufficient and subsequent affidavits revealed ongoing illegal transactions, subsequent authorizations for interception of other telephones were validly piggybacked), rev. denied, 434 So.2d 888 (Fla. 1983).
We reject DeBlasio's separate challenge to the wiretap of his telephone on the same basis. DeBlasio contends that the information obtained from the Elias wiretap constituted sufficient evidence to arrest him, thereby eliminating any need to wiretap his telephone. DeBlasio cites no authority for the proposition that the police are precluded from seeking a wiretap of a suspect's telephone merely because they already have grounds for his arrest.
Electronic surveillance is commonly used not only to gather evidence for prosecution, but also to determine the scope of a criminal organization, the extent and nature of its activities, and the identities of its participants. Surveillance of a backroom bookmaker, though it may obtain evidence against him, seeks principally to gain information about the overall operation's financiers and underwriters, who otherwise would remain undetected.
J. Carr, The Law of Electronic Surveillance § 1.2(b) (2d ed. 1987). "[E]lectronic surveillance is most useful when directed at large criminal conspiracies that both rely on oral communication and are vulnerable to being overheard by electronic surveillance." ABA Standards for Criminal Justice, Standard 2-1.1 commentary 2d ed. (1982). The evidence set forth in the Mart wiretap application pointed to the existence of a large-scale bookmaking operation emanating from Mart's telephones. The evidence available indicated that DeBlasio did not occupy a key role in this enterprise. The wiretap of only DeBlasio's telephone would not have revealed the extent of the operation or the identities of all the participants. Moreover, where the tap is authorized "because of probable cause to believe that a gambling conspiracy exists, and a major purpose is to uncover as many of those involved as possible, it would seem just and necessary to be more liberal in terms of coverage and content of the calls and persons making them." State v. Dye, 60 N.J. 518, 291 A.2d 825, 835, cert. denied, 409 U.S. 1090, 93 S.Ct. 699, 34 L.Ed.2d 675 (1972), modified on other grounds, State v. Catania, 85 N.J. 418, 427 A.2d 537 (1981). We conclude that the wiretap applications contained the requisite information to provide probable cause for electronic surveillance of the Mart and DeBlasio telephones.

C. Staleness
The appellants also allege that the affidavits for the Mart wiretap lacked probable cause because of staleness. The affidavits for the Mart wiretap chronicled activities occurring over a period of four months. In view of the length of time covered in the affidavits, the appellants claim that the affidavits failed to demonstrate evidence of current criminal activity, i.e., that the suspected bookmaking offenses were being committed or were about to be committed, and that the telephones were being used or were about to be used in connection with these offenses as required by section 934.09(3)(a), Florida Statutes (1983).[14]
*721 In the present case, the affidavits for the Mart wiretap alleged criminal activity from October, 1983, through January, 1984. The application for the electronic interception was filed and approved on January 17, 1984. The actual surveillance began on January 18, 1984, and was conducted for a total of eighteen days. In view of the allegations of bookmaking occurring over Mart's telephone lines during the four-month period monitored in the affidavits, it was reasonable to assume that the bookmaking transactions had not mysteriously stopped after January 17, the date of the wiretap application. See, e.g., Hudson v. State, 368 So.2d 899 (Fla. 3d DCA) (affidavit filed April 14 not rendered stale merely because it evidenced criminal activity only up until January 23 where probable cause was demonstrated that criminal activities and conversations had been occurring over defendant's telephones for the past several years), cert. denied, 378 So.2d 345 (Fla. 1979). The appellants may not challenge the sufficiency of the wiretap application where their claim of staleness is predicated on the fact that some of the events recounted in the January, 1984, affidavits dated back to October, 1983, when the investigation began. See Mitchell v. State, 381 So.2d 1066 (Fla. 1st DCA 1979) (staleness of information in affidavit for wiretap could not be computed from dates of first meetings between informants and affiant where numerous subsequent meetings took place between informants and affiant), appeal dismissed, 383 So.2d 1199 (Fla. 1980).
Moreover, where the evidence clearly shows a longstanding, ongoing pattern of criminal activity, it is more likely that the passage of time will not dissipate probable cause. "In such circumstances, it is reasonable to assume that the activity has continued beyond the last dates mentioned in the affidavit, and may still be continuing... . Therefore, when police describe telephone activity occurring over an extended period of time, the stale information issue should be construed less rigorously." United States v. Domme, 753 F.2d 950, 953 (11th Cir.1985), modified, United States v. Dennis, 786 F.2d 1029 (11th Cir.1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987). Accord United States v. Bascaro, 742 F.2d 1335, 1345 (11th Cir.1984), cert. denied, Hobson v. United States, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); Hudson, 368 So.2d at 902. See also Rodriguez v. State, 297 So.2d 15, 18 (Fla. 1974) (although thirty days from date of observation of alleged offense to date of affidavit was "rule of thumb" in evaluating staleness, nature of the illegal activity was also factor to be considered in assessing timeliness of affidavit). We conclude that the affidavits presented sufficient, current information for the issuing court to believe that the Mart and DeBlasio telephones were being used for illegal gambling at the time the wiretap applications were approved, and, therefore, that the affidavits were not stale.

D. Necessity
The appellants additionally allege that the affidavits in support of the Mart wiretap application were fatally defective because they failed to meet the "necessity" requirement of section 934.09(1)(c), Florida Statutes (1983).[15] We reject their contention that "the catalogue of other investigative procedures in the [a]pplication is full of bald conclusions with no relationship to the facts of this case." Our review of the affidavits reveals compliance with the statutory showing of necessity. The affidavits contained a full statement of investigative procedures which had been tried as well as a statement of the futility or danger of investigative methods *722 which had not been tried. It is not necessary for a law enforcement agency to show exhaustion of all other possible techniques before seeking wiretap authorization. United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); Hudson v. State, 368 So.2d 899 (Fla. 3d DCA 1979). Nor must every other conceivable method of investigation be unsuccessfully attempted before electronic surveillance will be authorized. United States v. Pacheco, 489 F.2d 554, 565 (5th Cir.1974), cert. denied, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). If wiretapping appears to be the most reasonable investigative technique to secure evidence of criminal activity, then section 934.09(1)(c) is satisfied. Covello v. State, 462 So.2d 1206 (Fla. 4th DCA 1985). See Zuppardi v. State, 367 So.2d 601 (Fla. 1978) (affidavits satisfied section 934.09(1)(c) where they explained that bookmaking suspects were known to transact business only with members of country club, that suspects communicated only in codes, and that informants were unwilling to assist in the investigation due to fear of physical danger).
The record in this case shows that the police officers who executed the Mart affidavits already had exhausted the avenues of physical surveillance and pen registers. The record further shows that alternate investigative methods would not have yielded additional evidence. "[T]he pursuit of gambling crime involves the absence or quick disappearance of records of gambling establishments, and the usually undecipherable or difficult-to-comprehend argot which is employed for concealment of the true nature of the activity." United States v. Caruso, 415 F. Supp. 847, 851 (S.D.N.Y. 1976), aff'd, 553 F.2d 94 (2d Cir.1977). As the affidavits for the Mart wiretap explained, a search warrant would have uncovered gambling paraphernalia, but not the identities of the conspirators or the extent of the operation because such information was generally reduced to codes. Undercover infiltration was impractical because Mart and his associates would not be eager to divulge the secrets of their enterprise to an outsider. Subpoenas and interviews only would have alerted the suspects to the existence of the police investigation.
In short, courts will not invalidate a wiretap order simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not. It is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves.
United States v. Hyde, 574 F.2d 856, 867 (5th Cir.1978). But cf. United States v. Kalustian, 529 F.2d 585 (9th Cir.1975) (error to deny appellants' motion to suppress electronic surveillance evidence where wiretap application failed to show why traditional investigative techniques were not viable alternatives).[16] We find that the affidavits fulfilled the necessity requirement of section 934.09(1)(c) by stating that normal investigative techniques had been tried and that other traditional avenues of investigation were not likely to succeed.
We find no merit in any of the challenges raised by the appellants to the trial court's denial of their consolidated motions to suppress the evidence obtained by electronic surveillance and, therefore, affirm the trial court's order.

II. CONSTITUTIONAL CHALLENGE TO SECTION 849.25, FLORIDA STATUTES (1983).
The appellants were charged by informations with the felony offense of bookmaking pursuant to section 849.25, Florida Statutes (1983). The appellants subsequently filed consolidated motions to dismiss the informations based upon their claim that the statute violated the equal protection and due process clauses of the fourteenth amendment to the United States Constitution and article I, section 9, of the Florida *723 Constitution.[17] The appellants devoted a substantial portion of their argument to the point that the conduct prohibited as a felony in section 849.25 and the conduct prohibited as a misdemeanor in section 849.14 are essentially identical, thus rendering section 849.25 susceptible to arbitrary and discriminatory application. Notwithstanding the appellants' contention or the validity of their arguments, the Florida supreme court has addressed this precise constitutional challenge to section 849.25 and resolved the question contrary to their position. State v. Cogswell, 521 So.2d 1081 (Fla. 1988).

III. EFFECT ON PLEAS AND SENTENCES
The validity of the nolo contendere pleas entered by eleven of the appellants[18] to the reduced misdemeanor charge of gambling in violation of section 849.08, Florida Statutes (1983), is unaffected by the Florida supreme court's approval of section 849.25 as constitutional. However, we find that the trial court erred in sentencing Sam Levanthal and Nick Satin in excess of the misdemeanor statutory maximum. Levanthal was sentenced to ninety days in the Dade County Jail and two years' probation. Satin was sentenced to one year probation. Both sentences exceed the maximum sentence for a second-degree misdemeanor. Smith v. State, 484 So.2d 581, 582 n. 1 (Fla. 1986); McGraw v. State, 404 So.2d 817 (Fla. 1st DCA 1981); Williams v. State, 402 So.2d 537 (Fla. 5th DCA 1981); Corraliza v. State, 391 So.2d 330 (Fla. 3d DCA 1980), rev. denied, 399 So.2d 1141 (Fla. 1981); §§ 775.082(4)(b), 948.04(1), Fla. Stat. (1983). We, therefore, vacate the sentences imposed. On remand we direct the trial court to correct the sentences of Sam Levanthal and Nick Satin.
Because section 849.25 (felony bookmaking) survives constitutional challenge, the judgments and sentences of Reuben Goldstein, John DeBlasio, and Stuart Levanthal are affirmed. Goldstein, DeBlasio, and Levanthal pled nolo contendere to violating section 849.25 and received probation terms appropriate to the felony charge.
Finally, we affirm the judgments and sentences of Alfred Mart and Bernard Shaktman who pled nolo contendere to violation of the Racketeer Influenced and Corrupt Organization statute [RICO], section 895.03, Florida Statutes (1983), based on a pattern of bookmaking activity. Section 849.25 is a specifically enumerated crime under the aegis of section 895.02. Even if the appellants had prevailed in their constitutional challenge to section 849.25, Shaktman and Mart would not be entitled to reversal of their judgments and sentences. The acts that trigger RICO may consist of felonies or misdemeanors or any combination thereof. In this respect, the scope of Florida RICO is broader than its federal counterpart. See Note, Racketeers and Non-Racketeers Alike Should Fear Florida's RICO Act, 6 Fla.St.U.L.Rev. 483 (1978). See also Carlson v. State, 405 So.2d 173 (Fla. 1981) (racketeering activity includes certain specified crimes under state law and under the federal RICO Act). It is the "[p]attern of racketeering activity," that is, "at least two incidents of racketeering conduct," which is the gravamen of a RICO offense. § 895.02(4), Fla. Stat. (1983). The crime to which Mart and Shaktman pled nolo contendere was racketeering. The section 849.25 violations referred to in the informations merely serve to make up the complete charge. Regardless of any constitutional infirmity in section 849.25, the validity of the RICO charge itself or the subsequent nolo pleas entered *724 by Mart and Shaktman would not be affected. See, e.g., Rogers v. State, 487 So.2d 57 (Fla. 3d DCA 1986) (defendant's conviction under RICO sustained where evidence showed scheme or plan to defraud and federal mail fraud statute was merely used to make up the complete state charge); DiSangro v. State, 422 So.2d 14 (Fla. 4th DCA 1982) (reversal of conviction on one of three predicate acts supporting conviction for violation of RICO did not entitle defendant to new trial on RICO conviction), rev. denied, 434 So.2d 887 (Fla. 1983). For these reasons, we affirm Mart's and Shaktman's RICO convictions and the sentences imposed thereon.
Affirmed; questions certified; remanded for conviction or sentencing in accordance with this opinion.

ON MOTION FOR REHEARING GRANTED
PER CURIAM.
The appellee state has directed our attention to an error in our opinion of March 29, 1988, regarding the validity of the sentence of Sam Levanthal. Our disposition of Levanthal's conviction and sentence was predicated on the written order of judgment which reflected that Levanthal had entered a nolo contendere plea to gambling, a second degree misdemeanor. As the state has noted, the sentencing guidelines scoresheet and the record of the plea colloquy reveal that the nolo plea actually entered by Levanthal was to bookmaking, a third degree felony. The sentence imposed was therefore appropriate to the charge to which the plea was entered. We, therefore, correct that portion of our opinion which had directed the trial court to resentence Levanthal pursuant to the gambling charge. We affirm Levanthal's judgment and sentence and remand to the trial court with directions to conform the written judgment to the trial court's oral pronouncements which reflect Levanthal's nolo plea to bookmaking in accordance with the plea colloquy and the guidelines scoresheet. See Roberts v. State, 512 So.2d 286 (Fla. 3d DCA 1987.)
NOTES
[1] "A pen register is a mechanical device that records numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." United States v. New York Tel. Co., 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366 n. 1, 54 L.Ed.2d 376, 382 n. 1 (1977). "Thus, a pen register discloses neither the subject of a communication between the caller and the recipient, their identities, nor whether the call was ever completed. A touch-tone decoder accomplishes the same results, with the same limitations, on a touch-tone telephone." Fishman, Pen Registers and Privacy: Risks, Expectations, and the Nullification of Congressional Intent, 29 Cath.U.L.Rev. 557, 558 n. 3 (1980). See P.J. v. State, 453 So.2d 470 (Fla. 2d DCA 1984) (device which could trace origin of incoming phone calls was not an "intercept" of conversations because there was no "aural acquisition" of contents of calls).
[2] Article I, section 12, reads as follows:

SECTION 12. Searches and seizures.  The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of the evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.
Fla. Const. art. I, § 12.
[3] Although State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982), involved toll billing records, the court concluded that the intrusion of privacy issue placed toll billing records "into the pen register mold." Id. 450 A.2d at 954.
[4] Florida is not the only state to determine that the warrantless use of a pen register does not subvert the privacy interests safeguarded by a state constitutional provision. See, e.g., State v. Thompson, 113 Idaho 466, 745 P.2d 1087 (Ct. App. 1987) (installation of pen register without judicial determination of existence of probable cause not violative of fourth amendment or state constitution "search and seizure" provisions); Hastetter v. Behan, 196 Mont. 280, 639 P.2d 510 (1982) (toll records of telephone subscriber not protected by state constitutional guarantee of privacy); State v. Valenzuela, 536 A.2d 1252 (N.H. 1987) (no constitutional violation in court's authorization of interception of contents of telephone calls despite fact that authorization was based on pen register information installed pursuant to court order unsupported by probable cause); People v. Guerra, 116 Misc.2d 272, 455 N.Y.S.2d 713 (1982) (warrantless use of pen register not violative of state constitution).
[5] Article I, section 23, provides:

SECTION 23. Right of privacy.  Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
Fla. Const. art. I, § 23.
[6] In addition to Florida, Alaska, Arizona, California, Hawaii, Illinois, Louisiana, Montana, South Carolina and Washington have right of privacy provisions in their state constitutions. For discussion of the comparative scope of these provisions, see generally Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 Fla.St.U.L.Rev. 673 (1978).
[7] The express language of section 23 states "except as otherwise provided herein," referring to the text of the entire Florida Constitution. The "herein" qualifier thus limits the context in which section 23 may be asserted and "establishes that other constitutional provisions are not affected by the privacy amendment, since the latter must give way to the extent of any conflict." Note, Interpreting Florida's New Constitutional Right of Privacy, 33 U.Fla.L.Rev. 565, 579-80 (1981).
[8] should be noted that the pace of technological change enhances the importance of privacy and legal mechanisms to protect it, whether it be through a freestanding privacy section such as article I, section 23, or through an unreasonable search, seizure, and interception provision such as section 12... . To be sure, the standards for sections 12 and 23 are very different, and the "reasonableness" criterion for section 12 is considerably less stringent than the compelling state interest test for section 23. But the common feature of the two is that both may impose, at some point, substantive limitations on the power of government to intrude on privacy.
Cope at 769.
[9] Significantly, Justice Barkett concluded in her dissent in State v. Hume, 512 So.2d 185 (Fla. 1987), that both sections 12 and 23 of article I were implicated. According to Justice Barkett:

There is no bright line between the privacy protections afforded under article I, section 12, and the privacy interests protected by article I, section 23. Section 23 comes into play in cases involving electronic surveillance because this aspect of governmental activity infringing on privacy is one that section 23 was particularly designed to check.
Id. at 190.
[10] was given to adding new standards to govern the issue of pen registers and similar devices that record numbers called from a monitored telephone without overhearing or recording conversations over that telephone. It was decided that the standards should be limited to the interception or overhearing of conversations... . As these standards do not cover other well-recognized investigative techniques that are essential to the effective use of electronic surveillance, such as the use of binoculars and telephoto camera lenses to assist in identifying the users of a particular telephone or the occupants of a particular public place, it was decided that they should not be expanded to cover pen registers.
ABA Standards for Criminal Justice, Electronic Surveillance, Introduction (2d ed. 1982).
[11] Sections 119.011(3)(b) and (4) read as follows:

119.011 Definitions.  For the purpose of this chapter:
* * * * * *
(3)(b) "Criminal investigative information" means information with respect to an identifiable person or group of persons compiled by a criminal justice agency in the course of conducting a criminal investigation of a specific act or omission, including, but not limited to, information derived from laboratory tests, reports of investigators or informants, or any type of surveillance.
* * * * * *
(4) "Criminal justice agency" means any law enforcement agency, court, or prosecutor. The term also includes any other agency charged by law with criminal law enforcement duties, or any agency having custody of criminal intelligence information or criminal investigative information for the purpose of assisting such law enforcement agencies in the conduct of active criminal investigation or prosecution or for the purpose of litigating civil actions under the Racketeer Influenced and Corrupt Organization Act, during the time that such agencies are in possession of criminal intelligence information or criminal investigative information pursuant to their criminal law enforcement duties.
§§ 119.011(3)(b), (4), Fla. Stat. (1983).
[12] We note that Congress has recently enacted legislation regulating the use of pen registers. See Electronic Communications Privacy Act of 1986, P.L. 99-508, 100 Stat. 1848-1873 (1986) (codified in pertinent part at 18 U.S.C. §§ 3121-3126). Because the relevant events in this case occurred prior to the enactment of the new statutory scheme, we expressly do not decide whether the federal legislation is binding upon state law enforcement officers. We further note that the federal legislation requires law enforcement agencies, when applying for a court order authorizing installation of a pen register, to identify the individual officer and the agency conducting the investigation and to include a certification that "the information likely to be obtained is relevant to an ongoing criminal investigation... ." 18 U.S.C.A. § 3122(b)(1), (2) (West Supp. 1987). The legislation purports to become binding upon the states on October 21, 1988; the Florida legislature may wish to amend appropriately chapter 934 prior to that date.
[13] Although this court has found an affidavit in support of a search warrant to be fatally insufficient to establish probable cause that an illegal lottery operation was being conducted where the only connection between gambling and the premises to be searched was the passing of brown paper bags from third parties to the occupants of the premises, Rodriguez v. State, 420 So.2d 655 (Fla. 3d DCA 1982), rev. denied, 429 So.2d 7 (Fla. 1983), we find that in the instant case the affidavits established in sufficient detail activities consistent with bookmaking.
[14] Section 934.09, Florida Statutes (1983), provides in relevant part:

(3) Upon such application, the judge may enter an ex parte order ... authorizing or approving interception of wire or oral communications ... if the judge determines on the basis of the facts submitted by the applicant that:
(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in s. 934.07.
§ 934.09(3)(a), Fla. Stat. (1983).
[15] The necessity requirement of section 934.09 is set forth as follows:

934.09 Procedure for interception of wire or oral communications. 
(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing... . Each application shall include the following information:
* * * * * *
(c) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.
§ 934.09(1)(c), Fla. Stat. (1983).
[16] Significantly, the Ninth Circuit in United States v. Kerrigan, 514 F.2d 35 (9th Cir.), cert. denied, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975), sustained the validity of a wiretap affidavit with the caveat that "the law does not require that a wiretap be used only as a last resort." Id. at 38.
[17] The due process clause of the Florida Constitution is set forth in section 9:

SECTION 9. Due process.  No person shall be deprived of life, liberty or property without due process of law, or be twice put in jeopardy for the same offense, or be compelled in any criminal matter to be a witness against himself.
Fla. Const. art. I, § 9.
[18] Appellants Milton Julius Shapiro, Eli Lee Shapiro, Alan Scott Tabb, Nicholas Sklaroff, Lewis Allen Mart, Robert Simon, Stanley Lawrence, Lawrence Levine, Sam Levanthal, Lawrence Sokoloff, and Nick Satin all pled nolo contendere to misdemeanor gambling in violation of section 849.08, Florida Statutes (1983).