620 So.2d 1256 (1993)
Antonio PEREZ, Petitioner,
v.
STATE of Florida, Respondent.
No. 76184.
Supreme Court of Florida.
June 24, 1993.
Bennett H. Brummer, Public Defender, and Howard K. Blumberg, Asst. Public Defender, Eleventh Judicial Circuit, Miami, for petitioner.
*1257 Robert A. Butterworth, Atty. Gen., and Michael J. Neimand, Asst. Atty. Gen., Miami, for respondent.
GRIMES, Justice.
We review State v. Perez, 592 So.2d 1099 (Fla. 3d DCA 1990), because of certified conflict with Spann v. State, 529 So.2d 825 (Fla. 4th DCA 1988). We have jurisdiction under article V, section 3(b)(4) of the Florida Constitution.
The pertinent facts of the case are summarized in the opinion of the district court of appeal:
Two uniformed City of Miami police officers were on patrol in an area known to be high in narcotics activity. They observed Perez and another male, who appeared to be passing an object between them. Believing that the two might be engaging in a narcotics transaction, one officer exited the police car and started to walk toward Perez. He either told Perez to freeze, or to stop. Perez fled on foot and the officer chased him. Perez ran into an alley while pulling something from his waistband. The officer heard a loud, metallic noise of something dropping in the alley. The officer caught Perez who, after being given Miranda warnings,[1] volunteered that he became nervous and ran "because he knew the gun that he had was stolen." A revolver was recovered in the alley. Perez was charged with carrying a concealed firearm and carrying a concealed firearm by a convicted felon. See §§ 790.01, 790.23, Fla. Stat. (1987).
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Perez, 592 So.2d at 1099.
Perez successfully moved to suppress the firearm prior to trial. The judge found that the police did not have reasonable suspicion to support an investigative stop under section 901.151, Florida Statutes (1987), and held that the firearm was seized as a direct result of the illegal stop. The Third District Court of Appeal reversed the order of suppression. While acknowledging the State's concession of the absence of reasonable suspicion for the stop, the court held that the firearm was admissible in evidence because it had been abandoned prior to any search. The court relied on its prior decision in State v. Oliver, 368 So.2d 1331 (Fla. 3d DCA 1979), cert. dismissed, 383 So.2d 1200 (Fla. 1980), in which it had held that "a person's otherwise voluntary abandonment of property cannot be tainted or made involuntary by a prior illegal police stop of such person. Only when the police begin to conduct an illegal search can a subsequent abandonment of property be held involuntary as being tainted by the prior illegal search... ." Id. at 1335-36 (citations omitted). Other cases supporting this view include Curry v. State, 570 So.2d 1071 (Fla. 5th DCA 1990), and Freyre v. State, 362 So.2d 989 (Fla. 3d DCA 1978), cert. denied, 372 So.2d 468 (Fla.), cert. denied, 444 U.S. 857, 100 S.Ct. 118, 62 L.Ed.2d 76 (1979).
In Spann v. State, 529 So.2d 825, the case certified as being in conflict, the police observed the defendant get out of a car and enter a nearby restaurant. A few minutes later the defendant returned to the car, whereupon the police ordered him to "freeze, stop." The defendant then dropped a package near his feet that proved to be cocaine. Because the defendant dropped the cocaine as a result of the illegal order to stop, the court held that the evidence must be suppressed. The court found the State's theory of abandonment unpersuasive.
Perez also cites State v. Bartee, 568 So.2d 523 (Fla. 1st DCA 1990), as being in conflict with the opinion below. In that case, a police officer asked the defendant if he had seen the direction taken by a suspect who had fled upon sight of the officer. The defendant nervously pointed to a duplex and then began to run away. The officer told him to stop but he continued to run. While he was running, he threw a pill bottle. The police retrieved the bottle and determined that it contained cocaine. The district court of appeal affirmed the suppression of the cocaine on the premise that the stop was illegal and rejected the State's claim of abandonment.
*1258 While this case was pending in this Court, the United States Supreme Court rendered its decision in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), which is directly on point. In Hodari, several youths fled at the approach of a police car. The police disembarked and gave chase. When one of the officers was almost upon him, Hodari tossed away a small rock before he was tackled. The rock was later determined to be cocaine. In the juvenile proceeding which ensued, the State conceded that it did not have reasonable suspicion to justify stopping Hodari. The United States Supreme Court framed the issue as whether, at the time he dropped the cocaine, Hodari was seized within the meaning of the Fourth Amendment of the United States Constitution. For purposes of its opinion, the Court assumed that the police pursuit was a "show of authority" calling upon Hodari to halt. However, the Court reasoned that a seizure does not occur until a person is physically subdued by the police or submits to an officer's show of authority. Therefore, the Court held that Hodari had not been seized as contemplated by the Fourth Amendment until he was tackled. The recovery of the cocaine that had been abandoned while he was running was not the fruit of an unlawful seizure.
By reason of the 1982 amendment to article I, section 12 of the Florida Constitution, this Court is bound to follow the United States Supreme Court's interpretations of the Fourth Amendment and to provide no greater protection than those interpretations. Bernie v. State, 524 So.2d 988 (Fla. 1988). According to the rationale of Hodari, the call for Perez to halt and the subsequent chase did not constitute a seizure until he was caught. In the meantime, he had abandoned the firearm. Because the recovery of the firearm was not the result of an illegal seizure, it should not have been suppressed.
We approve the decision of the court below. We disapprove Bartee to the extent that it is inconsistent with this opinion. However, we find Spann to be consistent with this opinion and with Hodari because there the defendant had submitted to the illegal order to stop when he dropped the cocaine.
It is so ordered.
McDONALD and HARDING, JJ., concur.
OVERTON, J., concurs with an opinion.
BARKETT, C.J., dissents with an opinion.
SHAW, J., dissents with an opinion, in which KOGAN, J., concurs.
KOGAN, J., dissents with an opinion, in which SHAW, J., concurs.
OVERTON, Justice, concurring.
In this case, I am presented with a difficult choice because Justices Shaw and Kogan have now accepted my dissenting view in Bernie v. State, 524 So.2d 988 (Fla. 1988), in which Justice Barkett joined. In that partial dissent, I disagreed with the majority by stating that the 1982 amendment to article I, section 12, of the Florida Constitution simply required this Court to interpret Florida's Constitution in accordance with decisions of the United States Supreme Court existing at the time the amendment was adopted. I wrote that, under the amendment, we were not required to make "unknown United States Supreme Court decisions part of our Florida Constitution." Id. at 994 (Overton, J., concurring in judgment). On the other hand, the majority in Bernie, and Justice Ehrlich in his concurring opinion, stated that the people of Florida voted to adopt under the Florida Constitution, the identical principles governing search and seizure that apply under the Fourth Amendment to the United States Constitution, including both past and future United States Supreme Court interpretations.
Justice Shaw and Justice Kogan have now changed their minds regarding their votes in Bernie and have accepted my view on this issue. Thus, the question with which I am currently presented is whether I should join them and as a result, overrule Bernie. This is a difficult question because, although I still believe in the view I *1259 expressed in Bernie, I also strongly believe that adhering to precedent is an essential part of our judicial system and philosophy of law.
The doctrine of precedent is basic to our system of justice. In simple terms, it ensures that similarly situated individuals are treated alike rather than in accordance with the personal view of any particular judge. In other words, precedent requires that, when the facts are the same, the law should be applied the same.
The question of when precedent should be overruled has recently become a significant issue of national interest because of changes in personnel on the United States Supreme Court and the justices' differing views on precedent, as reflected in their recent decision in Planned Parenthood v. Casey, ___ U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Before the Planned Parenthood decision, Justices Lewis Powell and John Paul Stevens wrote articles regarding stare decisis in which they took the view that adhering to precedent is an important part of our philosophy of how the law should be applied. They also expressed that, in overruling constitutional precedent, some justifiable reason should exist over and above the conclusion that the prior decision was simply erroneous. As stated by Justice Stevens:
[T]he question whether a case should be overruled is not simply answered by demonstrating that the case was erroneously decided and that the Court has the power to correct its past mistakes. The doctrine of stare decisis requires a separate examination. Among the questions to be considered are the possible significance of intervening events, the possible impact on settled expectations, and the risk of undermining public confidence in the stability of our basic rules of law. Such a separate inquiry is appropriate not only when an old rule is of doubtful legitimacy ... but also when an old rule that was admittedly valid when conceived is questioned because of a change in the circumstances that originally justified it.
John P. Stevens, The Life Span of a Judge-Made Rule, 58 N.Y.U.L.Rev. 1, 9 (1983) (emphasis added) (footnotes omitted). See also Lewis F. Powell, Jr., Stare Decisis and Judicial Restraint, J.S.Ct. History, 1991, at 13.
Subsequently, the majority applied the above view of stare decisis in refusing to overturn Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in the recent Planned Parenthood decision. Justices O'Connor, Kennedy, and Souter jointly wrote about the importance of precedent, with Justices Stevens and Blackmun concurring. In Planned Parenthood, the three justices explained that a special reason, such as a change of factual circumstances, had to exist to justify overruling Roe. In reaching that conclusion, they compared the reasons that justified the overruling of Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923), in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), which "signalled the demise" of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). Planned Parenthood, ___ U.S. at ___, 112 S.Ct. at 2812. Similarly, they also compared the reasons for overruling Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), by the Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Planned Parenthood majority, in concluding that none of the types of changes or special reasons that justified overruling those cases were present to justify overruling Roe, stated:
Within the bounds of normal stare decisis analysis, then, and subject to the considerations on which it customarily turns, the stronger argument is for affirming Roe's central holding, with whatever degree of personal reluctance any of us may have, not for overruling it.
___ U.S. at ___, 112 S.Ct. at 2812. In so stating, they made it clear that the mere belief that a case was wrongly decided is not justification for overruling a prior decision.
Because neither the factual underpinnings of Roe's central holding nor our understanding of it has changed (and *1260 because no other indication of weakened precedent has been shown) the Court could not pretend to be reexamining the prior law with any justification beyond a present doctrinal disposition to come out differently from the Court of 1973. To overrule prior law for no other reason than that would run counter to the view repeated in our cases, that a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided.

___ U.S. at ___-___, 112 S.Ct. at 2813-14 (emphasis added).
Chief Justice Rehnquist and Justices White, Scalia, and Thomas, on the other hand, believe that stare decisis need not be adhered to when ruling on a constitutional issue. As stated by Chief Justice Rehnquist: "We believe that Roe was wrongly decided, and that it can and should be overruled consistently with our traditional approach to stare decisis in constitutional cases." ___ U.S. at ___, 112 S.Ct. at 2855 (Rehnquist, C.J., concurring in part and dissenting in part). In that opinion, the Chief Justice also criticized the majority for refusing to address the issue of whether or not Roe was correctly decided.
Even before Planned Parenthood, Justice Scalia had expressed the belief that stare decisis need not be adhered to in constitutional cases. As he stated in South Carolina v. Gathers, 490 U.S. 805, 825, 109 S.Ct. 2207, 2218, 104 L.Ed.2d 876 (1989) (Scalia, J., dissenting), overruled by Payne v. Tennessee, ___ U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991): "I would think it a violation of my oath to adhere to what I consider a plainly unjustified intrusion upon the democratic process in order that the Court might save face." In Webster v. Reproductive Health Services, 492 U.S. 490, 532, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (Scalia, J., concurring in part), Justice Scalia also stated: "Justice O'Connor's assertion ... that a `"fundamental rule of judicial restraint"' requires us to avoid reconsidering Roe, cannot be taken seriously." Consistent with that view, Justice Scalia, in Planned Parenthood, stated that constitutional error on its face should be acknowledged and eliminated and that "Roe was plainly wrong." ___ U.S. at ___, 112 S.Ct. at 2875 (Scalia, J., concurring in part and dissenting in part).[1]
Since leaving the Court, Justice Powell has expressly opposed the Rehnquist/Scalia view of stare decisis, explaining that "[t]he elimination of constitutional stare decisis would represent an explicit endorsement of the idea that the Constitution is nothing more than what five Justices say it is. This would undermine the rule of law." Lewis F. Powell, Jr., Stare Decisis and Judicial Restraint, 47 Wash. & Lee L.Rev. 281, 288 (1990).
Even given these distinct views of stare decisis, how appellate judges who participated in a precedent-making decision adhere to that precedent depends largely on their view of the decision. Some judges, if they believe that no reasonable, legal basis for the majority's holding existed, never accept the majority's view in subsequent cases. This is illustrated by Justices Brennan's and Marshall's continued dissents in capital punishment cases. See, e.g., Harmelin v. Michigan, ___ U.S. ___, ___, 111 S.Ct. 2680, 2719, 115 L.Ed.2d 836 (1991) (Marshall, J., dissenting); Mu'Min v. Virginia, ___ U.S. ___, ___, 111 S.Ct. 1899, 1909, 114 L.Ed.2d 493 (1991) (Marshall, J., dissenting); Walton v. Arizona, 497 U.S. 639, 674, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Brennan, J., dissenting); Sawyer v. Smith, 497 U.S. 227, 245, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (Marshall, J., dissenting); Demosthenes v. Baal, 495 U.S. 731, 737, 110 S.Ct. 2223, 2226, 109 L.Ed.2d 762 (1990) (Brennan, J., dissenting); Clemons v. Mississippi, 494 U.S. 738, 755, 110 S.Ct. 1441, 1452, 108 L.Ed.2d 725 (1990) (Brennan, J., dissenting); Butler v. McKellar, 494 U.S. 407, 416, 110 S.Ct. 1212, 1219, 108 L.Ed.2d 347 (1990) (Brennan, J., dissenting). This, however, is really the exception rather than the rule.
*1261 Dissenters ordinarily accept the majority view in subsequent decisions where the issue involved two intellectually reasonable but opposing views. The latter situation is illustrated by Justice Powell's dissent in Bates v. State Bar, 433 U.S. 350, 389, 97 S.Ct. 2691, 2712, 53 L.Ed.2d 810 (1977), and his subsequent authoring of the majority opinion in In re R.M.J., 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), based on Bates. Another illustration involves this Court's decision in Bernie. Although Chief Justice Barkett and I dissented in Bernie, we subsequently accepted the majority view, as illustrated by Chief Justice Barkett's opinion in Robinson v. State, 537 So.2d 95 (Fla. 1989), where this Court unanimously held that the United States Supreme Court's decision in Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), had superseded our contrary holdings in Miller v. State, 403 So.2d 1307 (Fla. 1981), and Sanders v. State, 403 So.2d 973 (Fla. 1981).
More than ten years have passed since the 1982 amendment to article I, section 12, of the Florida Constitution was adopted, and our 1988 decision in Bernie has been consistently applied by this Court and other courts of this state for the past five years. See, e.g., Robinson v. State, 537 So.2d 95 (Fla. 1989); Heller v. State, 576 So.2d 398 (Fla. 5th DCA 1991); State v. Robinson, 565 So.2d 730 (Fla. 2d DCA), review dismissed, 574 So.2d 143 (Fla. 1990); Brown v. State, 561 So.2d 1248 (Fla. 2d DCA 1990); State v. Starkey, 559 So.2d 335 (Fla. 1st DCA 1990); Sutton v. State, 556 So.2d 1211 (Fla. 2d DCA 1990); State v. Norman, 545 So.2d 465 (Fla. 4th DCA 1989); Renckley v. State, 538 So.2d 1340 (Fla. 1st DCA 1989); Wyche v. State, 536 So.2d 272 (Fla. 3d DCA 1988), review denied, 544 So.2d 201 (Fla. 1989); State v. Smith, 529 So.2d 1226 (Fla. 3d DCA 1988); Shaktman v. State, 529 So.2d 711 (Fla. 3d DCA 1988), approved, 553 So.2d 148 (Fla. 1989). Moreover, there is no question that our Bernie decision is a significant watershed case that has major ramifications involving multiple search and seizure issues that are regularly raised in the trial courts of this State.
How our law has changed by reason of the 1982 constitutional amendment and the Bernie decision is illustrated by our decision in Robinson. Furthermore, other decisions, such as Florida v. Riley, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), and Florida v. Bostick, ___ U.S. ___, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), in which the United States Supreme Court reversed decisions of this Court, might have had totally different outcomes if we had relied only on the construction of the Florida constitutional provision rather than adhering to interpretations of the Fourth Amendment by the United States Supreme Court. Indeed, since 1983, there have been over fifty United States Supreme Court search and seizure decisions construing the Fourth Amendment  all of which are now embodied in Florida law in accordance with Bernie and have been consistently relied upon by the courts of this state in construing search and seizure law. Overruling Bernie at this time would clearly affect the coherence of the law of search and seizure in this state.
Although I still adhere to the views I initially expressed in Bernie, I cannot, with intellectual honesty, say that the majority's position was entirely without a factual or legal basis. Furthermore, and more importantly, I find that nothing has changed or occurred since the Bernie decision to justify altering the majority's holding in that case. Consequently, to vote to join those members of this Court who would now overrule Bernie would require me to accept the Rehnquist/Scalia philosophy of constitutional stare decisis. This I am unwilling to do. It appears that my colleagues in dissent have accepted the Rehnquist/Scalia philosophy. However, I believe, as does Justice Powell, that such a philosophy undermines the rule of law and places courts in the political arena. Instead, I choose to follow the philosophy of constitutional stare decisis as expressed and adopted by the majority in Planned Parenthood.[2] Accordingly, I concur in the majority opinion.
*1262 BARKETT, Chief Justice, dissenting.
I agree with Justice Shaw's and Justice Kogan's conclusion that stare decisis does not control the outcome of this case, and I would apply Justice Shaw's analysis of article I, section 12 of the Florida Constitution to quash the decision below. I feel compelled to comment further, however, because in what must be the first time in history, this Court is issuing a majority decision with which the majority disagrees. This unprecedented result is founded on Justice Overton's view of stare decisis.
Justice Overton concedes that the majority opinion violates his reason and his conscience. Indeed, he adheres to the dissent he wrote five years ago when he said the Court's decision in Bernie v. State, 524 So.2d 988 (Fla. 1988), was wrong. Yet, today, Justice Overton concurs to cast the deciding vote in a majority opinion that reaffirms the very rule of law he, and the majority of this Court, believes was wrongly decided.
Justice Overton's reliance on the theory of stare decisis does not support his position, for stare decisis has never been applied in a context such as this. Stare decisis is a judicially created theory designed to support a judge's decision to follow precedent for practical and prudential reasons. Stare decisis does not mean that a judge is required to follow precedent when, in doing so, the judge forfeits the opportunity to correct an erroneous decision and instead preserves the rule that the judge knew then and knows now was wrongly decided. Following the course suggested by Justice Overton would require this Court to perpetuate its error forever. Stare decisis has never stood for this proposition. To the contrary, as former Justice Ehrlich stated so eloquently,

Perpetuating an error in legal thinking under the guise of stare decisis serves no one well and only undermines the integrity and credibility of the Court. This is true whether the prior decision dealt with a common law rule, a question of statutory construction, or an issue of constitutional interpretation. When a prior decision from this Court interprets the Florida Constitution erroneously, the gravity of the error takes on a new and more far reaching dimension because it is this Court's unique and ultimate responsibility to interpret our organic law in such a way as to render it meaningful.
Smith v. Department of Ins., 507 So.2d 1080, 1096 (Fla. 1987) (Ehrlich, J., concurring *1263 in part, dissenting in part) (emphasis supplied); see also, e.g., Smith v. Allwright, 321 U.S. 649, 665, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944) ("when convinced of former error, this Court has never felt constrained to follow precedent").
Justice Overton explains his decision with the view that "a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided." Op. at ___ (Overton J., concurring) (quoting Planned Parenthood v. Casey, ___ U.S. ___, ___, 112 S.Ct. 2791, 2814, 120 L.Ed.2d 674 (1992) (plurality op. of O'Connor, J.)) (emphasis supplied).[3] Justice Overton's reliance on Planned Parenthood is entirely misplaced. The majority decision in that case was not dictated by stare decisis because none of the Justices took positions in Planned Parenthood that were contrary to their previously expressed and presently held views.[4] Moreover, this Court, including Justice Overton, has repeatedly voted to overrule or recede from constitutional precedent simply because the precedent was wrongly decided.[5]
Finally, contrary to Justice Overton's assertion, overruling Bernie would not *1264 "clearly affect the coherence of the law." Op. at 1261 (Overton, J., concurring). In fact, overruling here may well have less of an effect on the law than other decisions in which he voted to overrule precedent. Moreover, overruling Bernie can be done prospectively only, thereby leaving undisturbed the decisions that followed Bernie. Prospective application would give effect to what Justice Overton consistently and correctly has maintained to be the intent of the people in amending article I, section 12, without affecting the coherence of the law.[6]
I believe that the difficult constitutional obligation to "judge" requires us on occasion to recede from or overrule precedent, constitutional or otherwise, where reason and conscience dictate that the prior cases were wrongly decided. Stare decisis cannot support a decision to defeat what a judge admits to be the intent of the electorate and the plain meaning of an express provision of the Florida Constitution.
SHAW, Justice, dissenting.
I disagree with the majority's conclusion that California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991),[7] controls this case. I would analyze this case under article I, section 12, Florida Constitution, and hold that the evidence must be suppressed as fruit of an illegal seizure.

I. FACTS
Perez was arrested and charged with carrying a concealed firearm and carrying a concealed firearm by a convicted felon in violation of sections 790.01 and 790.23, Florida Statutes (1987). Perez sought to suppress the gun, claiming it was obtained by police in violation of article I, section 12, Florida Constitution, and the Fourth and Fourteenth Amendments to the federal Constitution. Relevant evidence at the suppression hearing included the arresting officer's deposition. Officer Carrasco gave the following account:
A. We were parked at a Winn Dixie facing Southwest First Street. I saw [Perez] and a white male. They were talking. He acted very suspicious. The both of them did.
Q. What did you see which lead [sic] you to believe they were acting suspiciously?
Exactly what were they doing as best you can recall?
A. What I saw was he kept looking at [our] police car, okay, he kept talking to the white male and they got very close like they were passing something between each other, okay. That's what lead [sic] me to believe they were doing some kind of narcotics transaction... .
... .

*1265 A. I exited my police car. I was walking towards him because we were facing south. Okay. He [passed] the police car. I was walking towards him. At this time he saw me as I was approaching him. I don't recall what I told him. I believe I told him to stop, freeze. At this time he ran from me.
Q. Might you have said, hey, you?
... .
A. No. I wouldn't have said hey, you. I would have said freeze, stop.
... .
Q. Other than that, you had no other reason to stop him or approach him?
A. No.
Officer Carrasco pursued Perez through an alley, where Perez discarded a revolver before being apprehended. The trial court ruled that the officer lacked reasonable suspicion to stop Perez and suppressed the revolver as fruit of an illegal seizure. The district court reversed. The present majority approves the district court decision, ruling that under Bernie v. State, 524 So.2d 988 (Fla. 1988), this Court is bound to interpret article I, section 12, Florida Constitution, in conformity with the federal Court's Fourth Amendment jurisprudence. The majority concludes that under Hodari no Fourth Amendment seizure took place until Perez was caught; thus the discarding of the firearm was not embraced by the Fourth Amendment and the gun should not have been suppressed.

II. THE CONFORMITY AMENDMENT
Initially, I would recognize the primacy of our state constitution and decide this case under article I, section 12, Florida Constitution, rather than under the United States Supreme Court's Fourth Amendment jurisprudence. In November 1982, the people of Florida by general election amended section 12 as follows:
Searches and seizures.  The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

(Emphasis denotes amendment.) The ballot statement provided:
Constitutional Amendment
Article I, section 12
SEARCHES AND SEIZURES.  Proposing an amendment to the State Constitution to provide that the right to be free from unreasonable searches and seizures shall be construed in conformity with the 4th Amendment to the United States constitution and to provide that illegally seized articles or information are inadmissible if decisions of the United States Supreme Court make such evidence inadmissible.
HJR 31-H, 1982 Fla. Laws 2200.
This Court subsequently addressed the divisive issue of whether the amendment requires conformity to only those decisions of the federal Court rendered prior to the election, or to those decisions rendered both before and after:
To summarize, we hold (1) the 1982 amendment to article I, section 12, of the Florida Constitution brings this state's search and seizure laws into conformity with all decisions of the United States Supreme Court rendered before and subsequent to the adoption of that amendment... .
Bernie v. State, 524 So.2d 988 (Fla. 1988). I note that the decision in Bernie elicited *1266 five separate written opinions by the Justices, including spirited dissents, with only three Justices joining completely in the per curiam opinion.
I quote at length from the concurring opinion of Justice Overton:
I believe the 1982 amendment simply requires this Court to interpret the Florida constitutional provision, section 12 of article I, in accordance with the United States Supreme Court decisions existing at the time the amendment was adopted. United States Supreme Court decisions rendered after November, 1982, should be considered only persuasive authority. My reasoning is twofold. First, a constitution, in the American sense, is a written document totally superior to the operations of government. As such, neither our legislature, by statutes, nor our courts, through decisions, can amend the Florida Constitution. The majority compromises this principle by allowing the federal government to amend our constitution by unknown future decisions of the United States Supreme Court. To interpret the new constitutional provision set forth in article I, section 12, to mean that its application depends entirely on the future whims of the United States Supreme Court and its decisions, whatever their result, is contrary to the meaning and purpose of a constitution... .
Second, I object to the prospective required tie-in to United States Supreme Court decisions because I subscribe to the principles we set forth for the legislature in Freimuth v. State [272 So.2d 473 (Fla. 1972)]. In that case ... [w]e stated that it is "`an unconstitutional delegation of legislative power for the legislature to adopt in advance any federal act or the ruling of any federal administrative body that Congress or such administrative body might see fit to adopt in the future.'" The principle is clear that new laws should be controlled by representatives of the people, not by a broad designation to a governmental entity outside the state and not responsible to the citizens of the state. I apply the same principle to this constitutional provision.
Bernie, 524 So.2d at 994-95 (Overton, J., concurring in judgment) (footnote and citations omitted).
Having joined in the Bernie majority opinion, I now acknowledge my error and subscribe fully to Justice Overton's view. I agree that the amendment should not be given prospective application. In addition to the cogent reasoning expressed above, I believe that prospective application directly violates article V, section 1, Florida Constitution, which provides in part:
SECTION 1. Courts.  The judicial power shall be vested in a supreme court, district courts of appeal, circuit courts and county courts. No other courts may be established by the state... .
The plain intent of this provision is to ensure that state legal issues are resolved by authorized state courts only. Prospective application of the amendment vests in the federal Court exclusive judicial power to determine the interpretation placed upon a state constitutional provision. Under Bernie, the state has in effect established an unauthorized foreign forum for resolving critical issues concerning constitutionally guaranteed state rights of Florida citizens. Such a situation would have been unthinkable to the original drafters of article I, section 12, and article V, section 1.[8]
In the present case, I would recede from the majority ruling in Bernie, adopt Justice Overton's concurring opinion there, and analyze the present facts under article I, section 12, Florida Constitution, embracing as controlling authority those Fourth Amendment decisions of the United States Supreme Court rendered prior to the 1982 election and as merely persuasive authority those rendered after.

III. STARE DECISIS
I adhere to the view of stare decisis expressed by the majority of the federal *1267 Court in Planned Parenthood v. Casey, ___ U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Accordingly, I endorse Justice Overton's recitation of the principles underlying this doctrine as set forth in his present concurring opinion. Unlike Justice Overton, however, I do not feel that stare decisis is applicable here.
The doctrine of stare decisis holds simply that a court when deciding a particular legal issue will pay due deference to its own past decisions on the same point of law. This is a judge-made rule created to assist courts in rendering decisions by making the work of judges easier, fostering stability in the law, and promoting public respect for the law as an objective, impersonal set of principles. The doctrine is particularly useful when a court is asked to fashion or apply some abstract legal rule or principle, or where a court must choose between equally compelling legal theories. When faced with a constitutional issue, for instance, courts oftentimes must define or apply a centuries-old phrase or clause that has been subject to vast judicial construction and scholarly analysis, such as "due process of law," "equal protection of the laws," "unreasonable searches and seizures," "compelled ... to be a witness against himself," or "assistance of counsel."
The constitutional issue decided in Bernie, however, differs fundamentally from those noted above. This Court was called upon in Bernie not to determine the legal import of some vague and hoary phrase that has been interpreted extensively throughout the decades, but rather to answer a simple, very practical question about the recent 1982 election: What was the intent of the electors? Did Florida's citizens intend our state courts to conform with all search and seizure rulings of the federal Court, both past and future, or merely to conform with past rulings? The majority opinion  a study in practicality  looked at the plain language of the amendment and disposed of the question in a single sentence: "The language of article I, section 12, clearly indicates an intention to apply to all United States Supreme Court decisions regardless of when they are rendered." Bernie, 524 So.2d at 991.
Justice Overton dissented unequivocally on the issue of the electors' intent:
A fair reading of this constitutional provision does not justify a conclusion that the people knew, in ratifying the 1982 amendment to the Florida Constitution, that they were voting to approve future unknown decisions of the United States Supreme Court as part of their constitution. If prospective application had been intended, both the amendment and the ballot would have clearly reflected that intent.
Bernie, 524 So.2d at 995 (Overton, J., concurring in judgment). Upon reflection, I now share Justice Overton's assessment, and because I believe the electors' intent is the polestar that must guide this Court irrevocably in implementing the amendment, I find the doctrine of stare decisis inapplicable. The legal reasoning expressed by the majority in Bernie is clearly not sufficiently compelling on its own to warrant continued support for the opinion, since there was no legal reasoning whatsoever in that opinion on this point. See Bernie, 524 So.2d at 990-91.
I feel compelled to comment on Justice Overton's stare decisis analysis. Although Justice Overton today stands by his earlier position  i.e., he insists the electors did not intend prospective application  he nevertheless declines to implement the intent of the electors, as he would have done at the time of Bernie, and instead relies on stare decisis principles to reaffirm Bernie. To overrule that case, he contends, would "undermine the rule of law," since several decisions from this Court and Florida's district courts have relied on Bernie in the five years since that opinion was issued.
In my opinion, nothing could shake the rule of law more thoroughly than Justice Overton's vote today. To assert that the electors did not intend prospective application of the conformity amendment and then to force prospective application upon our citizens anyway in order to protect a wrongly-decided opinion of this Court stands traditional constitutional thinking on *1268 its head. Rather than disapprove the handful of cases that have followed Bernie, Justice Overton has chosen to condemn the people of Florida to endure for all time a course they did not intend involving one of our most important individual rights. He has, in effect, elevated a judge-made rule of convenience above the intent of the electors.
I am reminded of the words of warning Abraham Lincoln voiced over a century ago:
[T]he candid citizen must confess that if the policy of the Government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court ... the people will have ceased to be their own rulers, having to that extent practically resigned their Government into the hands of that ... tribunal.
A. Lincoln, First Inaugural Address (Mar. 4, 1861), reprinted in Inaugural Addresses of the Presidents of the United States, S. Doc. No. 101-10, p. 139 (1989).

IV. THE APPLICABLE LAW
To resolve the present case, the following issues must be addressed: (1) whether Perez was "seized" within the meaning of section 12; and (2) if he were in fact seized, whether police had adequate grounds; and finally (3) if police lacked adequate grounds, whether the resulting illegal seizure impermissibly tainted the discarding of the firearm. Before these issues can be decided, however, the relevant section 12 legal principles must be defined: This Court must determine what constitutes a "seizure" under section 12; what justification is required for a seizure; and whether property that is discarded following an illegal seizure is admissible. I would address these matters as follows.
As noted above, article I, section 12, Florida Constitution, provides in part that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures ... shall not be violated." This provision protects Florida citizens from unreasonable government intrusion into those areas of their lives where they harbor a reasonable expectation of privacy.[9] Unquestionably, a person's freedom from seizure of his or her person is embraced within this proscription.[10]
Not every encounter between citizen and police constitutes a seizure. No seizure takes place, for instance, where officers approach a citizen in an open and unrestricted public place, identify themselves as police officers, inquire whether they may ask questions, and  where the citizen of his own free will is willing to listen  ask questions.[11] The citizen, however, need not respond and is always free to leave or request to be left alone,[12] for no citizen may be detained or otherwise engaged by police, even momentarily, against his or her expressed will without reasonable, objective grounds,[13] as explained below. Conversely, whenever the state, by means of physical force or show of authority, restricts in any manner an individual's freedom of movement or right to be let alone, that person has been "seized" for section 12 purposes, requiring objective justification.[14] I would apply the following test for *1269 determining when this standard has been met: A person is seized whenever, in view of all the circumstances, a reasonable person innocent of any crime would believe that he or she is not entirely free[15] to end the encounter.[16]
To determine whether a particular type of government intrusion into a protected area is "reasonable," the need for the search or seizure is balanced against the nature of the intrusion.[17] An objective standard of government justification must be met; the greater the intrusion, the greater the justification. For instance, the state's need to intrude on the physical freedom of its citizens at times outweighs the invasion of autonomy occasioned by seizure of the person. Thus, a traditional arrest is reasonable where police have probable cause to believe  i.e., where a substantial probability exists  that a crime has been committed and that the suspect committed it. See generally §§ 901.02, .15, Fla. Stat. (1989). A temporary investigative stop, on the other hand, is permissible where police have a reasonable suspicion  i.e., a particularized and objective basis for suspecting  that the suspect has committed, is committing, or is about to commit a crime. See generally § 901.151, Fla. Stat. (1989).
Section 12 provides that evidence obtained in violation of its proscription "shall not be admissible." Art. I, § 12, Fla. Const. The test for admissibility is
whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.
Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quotation marks omitted).[18] Property that has been discarded in direct response to illegal police conduct must be suppressed.[19]

*1270 V. APPLICATION TO PRESENT FACTS
Unquestionably, Perez was entitled to section 12 protection from seizure of his person as he stood on the corner, conversing with another. When Officer Carrasco approached and ordered him to "stop, freeze," Perez effectively was seized; a reasonable person would not have felt free to end the encounter with the officer. In fact, a reasonable person would have felt just the opposite  the words were a clear and unambiguous show of authority commanding Perez not to leave or otherwise attempt to terminate the confrontation.
Under the present facts, the officer lacked reasonable suspicion to support the seizure and the state concedes this. I would reject the state's argument that the discarding of the firearm was sufficiently separated from the illegal seizure to dispel the taint. The uncontested facts establish that the illegal stop and the chase immediately following were so closely connected that the disposal of the firearm during the chase can only be attributed to the illegal stop. There were no intervening circumstances to dissipate the taint of the illegal stop.
I would hasten to add that I would not adopt a "but for" rule under which all property discarded at any time following an illegal stop must be suppressed simply because the evidence was discarded or discovered because of the illegal stop. Had Perez eluded the police and discarded the firearm in the trash the following day, it could be reasonably said that under the principles of Wong Sun the subsequent discovery of the firearm had been accomplished "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488, 83 S.Ct. at 418 (quotation marks omitted).
I would quash the district court decision and remand for further proceedings.
KOGAN, J., concurs.
KOGAN, Justice, dissenting.
Like Justice Shaw, I also must acknowledge the error I made in Bernie when I found that the 1982 amendment to article I, section 12 incorporated future opinions of the United States Supreme Court. See Bernie, 524 So.2d at 995-99 (Kogan, J., concurring in part, dissenting in part). While I now fully and completely concur in Justice Shaw's dissent and scholarly analysis, I write separately only to explain the assumptions that led to this error and why it now demands the correction Justice Shaw propounds.
At the time Bernie was written, the United States Supreme Court had not yet fully begun the precipitous retreat from its own precedent that characterizes the nation's high Court today. While there may have been a handful of cases that were harbingers of this development, the United States Supreme Court in 1988 still generally adhered to the search-and-seizure jurisprudence it had developed during the last half century. Few could have foreseen the extent of the high Court's recent activities. Certainly, the separate opinion I wrote in Bernie as well as the plurality opinion in which I partially concurred assumed that the United States Supreme Court would not subtract from the rights recognized in the precedent that existed at the time the voters approved the 1982 amendment to article I, section 12.
*1271 This has not been the case. The opinion in Hodari D. marks only one of several recent cases in which the United States Supreme Court has retreated dramatically from its own precedent, often without even acknowledging that existing rights are being nullified. As only one of many examples I note the decision in Payne v. Tennessee, ___ U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), that defied stare decisis and squarely overruled Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Payne Court did so for no better reason than that Booth and Gathers "were wrongly decided." Payne, ___ U.S. at ___, 111 S.Ct. at 2611.
Thus, the decision to reaffirm Bernie today is the exact antithesis of an adherence to stare decisis. It effectively locks this Court's search-and-seizure law into the precise same disrespect for stare decisis that de facto has prevailed in the nation's highest Court.[20] While the majority may purport to honor stare decisis, it in fact abdicates the very principle to a Court in Washington that is no respecter of stare decisis.
I also note that even if the majority purports to adhere to something like the federal doctrine of stare decisis, it is not doing so in a manner consistent with what the high court has said of the doctrine in Payne. This conclusion particularly is underscored by the comments of the concurring Justices. Associate Justices O'Connor and Kennedy joined with Associate Justice Scalia in the following remarks in Payne:
[Stare decisis] "is not `an imprisonment of reason'." If there ever was a case that defied reason, it was Booth v. Maryland, imposing a constitutional rule that had absolutely no basis in constitutional text, in historical practice, or in logic.
... .
Today, however [the dissent] demands of us some "special justification"  beyond the mere conviction that the rule of Booth significantly harms our criminal justice system and is egregiously wrong  before we can be absolved of exercising "[p]ower, not reason." I do not think that is fair. In fact, quite to the contrary, what would enshrine power as the governing principle of this Court is the notion that an important constitutional decision with plainly inadequate rational support must be left in place for the sole reason that it once attracted five votes.
Payne, ___ U.S. at ___, 111 S.Ct. at 2613 (citations omitted). Likewise, Associate Justices Souter and Kennedy went on to add in Payne:
In prior cases, when this Court has confronted a wrongly decided, unworkable precedent calling for some further action by the Court, we have chosen not to compound the original error, but to overrule the precedent.
Id., ___ U.S. at ___, at 2618. The precise same logic applies here: When a court makes a serious mistake, it does not have to remain a mistake forever just because it was a court that did it. Judges are not infallible. We do not live under the law of the Medes and Persians, whose decrees the Bible says "altereth not" once issued. Daniel 6:8 (King James).
In light of the United States Supreme Court's recent actions, we now must confront the inherent and absurd contradictions created by the holding in Bernie. That case now stands for the absurd proposition that the voters in 1982 intended for our own Constitution to mean something that no one possibly could have foreseen or intended in 1982. This defies logic and stretches credulity beyond the stars.
It is not reasonable to conclude that the voters in 1982, after approving constitutional language expressly incorporating federal case law, intended this language to mean something less than what that case law said at the time the voters gave their assent. This is the political equivalent of writing a blank check. The fact that the *1272 United States Supreme Court later may recede from or undercut some of its own cases cannot reasonably be construed as a retroactive statement of the Florida voters' intent when those voters earlier have approved a provision of the Florida Constitution that draws upon or otherwise implicates some aspect of federal law. Future statements of the United States Supreme Court in no sense reveal what the voters of Florida may intend today.
Likewise, I agree with Justice Shaw that the decision in Bernie, when read in light of the recent United States Supreme Court cases, creates a grave and needless conflict between article I, section 12 and article V, section 1 of the Florida Constitution. The latter provision declares that the judicial power shall be vested solely in the Florida Supreme Court, the district courts of appeal, and the circuit and county courts. Art. V, § 1, Fla. Const. It does not say that this power shall be vested in these courts, except for the authority to interpret article I, section 12 of the Florida Constitution.
In other words, Bernie holds by necessary implication that the authority to interpret part of the Florida Constitution is vested exclusively in the United States Supreme Court. This construction partially nullifies article V, section 1, thereby violating settled rules of constitutional construction. As our own case law holds, a construction should be adopted that gives every word of the state Constitution a meaning:
Where a constitutional provision will bear two constructions, one of which is consistent and the other [of] which is inconsistent with another section of the constitution, the former must be adopted so that both provisions may stand and have effect.
Burnsed v. Seaboard Coastline R.R., 290 So.2d 13, 16 (Fla. 1974). The construction elaborated today by Justice Shaw and earlier by Justice Overton most nearly meets this requirement, because it gives full effect to article V, section 1 while also giving a reasonable and consistent effect to the 1982 amendments to article I, section 12.
One other factor plays strongly in my decision to recede from the views I announced in my Bernie opinion: In light of the activities of the United States Supreme Court, Bernie now effectively holds that the voters intended to subtract from their state constitutional rights even though they were not told that this would be the effect of their vote. Obviously, the ballot summary attached to the 1982 amendment could not possibly have foreseen this result and warned voters of it.
In the recent case of People Against Tax Revenue Mismanagement, Inc. v. County of Leon, 583 So.2d 1373 (Fla. 1991), I wrote the following relevant comment on behalf of a unanimous Court:
[W]e have overturned an election because of defective ballot language where the proposal itself failed to specify exactly what was being changed, thereby confusing voters. This especially is true if the ballot language gives the appearance of creating new rights or protections, when the actual effect is to reduce or eliminate rights or protections already in existence.
Id. at 1376 (citing Wadhams v. Board of County Comm'rs, 567 So.2d 414, 416-17 (Fla. 1990); Askew v. Firestone, 421 So.2d 151, 154 (Fla. 1982)). Thus, voters have a right to know the full and precise effect of what they are voting for, particularly if rights are being eliminated. Id. If voters are not so warned, then either the proposal must be removed from the ballot or the amendatory language must be construed so that voters are not subjected to the undisclosed diminution of rights.[21]
*1273 In light of what the United States Supreme Court has done, Bernie obviously and blatantly violates this principle. Bernie says that the 1982 voters intended to diminish their rights in lock-step with the federal courts, even though these voters could not possibly have been warned of the true impact this would have in the world of the 1990s. Because I believe the voters have a right to know exactly how their rights will be diminished when they amend the Constitution, I now find it unreasonable to construe the 1982 amendment in a way that subjects these same voters to the hasty and unforeseeable erosion of rights being effected by the United States Supreme Court. All that is reasonable is to construe this amendment as the voters themselves must surely have seen it: To incorporate within article I, section 12 all search-and-seizure precedent of the United States Supreme Court up to the date of the election, but nothing else.
I respectfully dissent for the reasons expressed eloquently by Justice Shaw, in whose dissent I fully concur.
SHAW, J., concurs.
NOTES
[1] The same view, that stare decisis does not apply in constitutional cases, was also addressed by Charles J. Cooper in Stare Decisis: Precedent and Principle in Constitutional Adjudication, 73 Cornell L.Rev. 401 (1988).
[2] In view of comments contained in Chief Justice Barkett's and Justice Shaw's dissenting opinions, I find it necessary to respond concerning two issues. The first is the allegation that my views regarding stare decisis as expressed in this concurrence are inconsistent with my past voting record in overruling previous decisions of this Court. The second is the assertion that overruling Bernie would not affect the coherence of this state's search and seizure law.

With regard to the first issue, a close reading of the opinions cited in the footnote to Chief Justice Barkett's dissent reflects that the cases cited were not actually overruled or that a "special reason" existed for overruling them. For example, in Fine v. Firestone, 448 So.2d 984 (Fla. 1984), this Court did not overrule Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978). In fact, in Fine, this Court reaffirmed a majority of the principles set forth in Floridians. We simply receded from Floridians to the extent that we approved a factor to be considered in evaluating the single-subject requirement of an initiative petition that had been rejected in Floridians. Admittedly, in Florida Greyhound Owners & Breeders Ass'n v. West Flagler Assocs., 347 So.2d 408, 412 (Fla. 1977), I did say, "[T]he time has come to recede from Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965)"; however, the dissent fails to point out that I went on to say, "This Court does not have sufficient time to give deliberative consideration to the second appeals that are being filed here under the Foley doctrine." Id. In my view, that constituted a "special reason" for questioning the holding in Foley.
With regard to the second issue, the coherence of search and seizure law in Florida, I note that "cohere" means "to hold together firmly" and to be "united in principles." Webster's Ninth New Collegiate Dictionary 257 (1986). As noted in this concurrence, the United States Supreme Court has rendered more than fifty search and seizure decisions since the 1982 amendment became part of our constitution. Those decisions are now part of the criminal law of this state. To overrule Bernie would place in doubt the applicability in Florida of those United States Supreme Court decisions because many of them would present significant issues for this Court to consider under article I, section 12, of the Florida Constitution as it existed before January 1, 1983. Given the large number of Florida cases that have relied upon those United States Supreme Court decisions, overruling Bernie would indeed have a substantial effect on the coherence of the search and seizure law of this state.
[3] I do concur with Justice O'Connor's view of stare decisis in City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), where she wrote:

Although respect for stare decisis cannot be challenged, "this Court's considered practice [is] not to apply stare decisis as rigidly in constitutional as in nonconstitutional cases." Although we must be mindful of the "desirability of continuity of decision in constitutional questions .. . when convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions."
462 U.S. at 458-59, 103 S.Ct. at 2507 (O'Connor, J., dissenting) (emphasis supplied) (citations to quoted material omitted).
[4] Compare Planned Parenthood v. Casey, ___ U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) with Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990), and Hodgson v. Minnesota, 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990), and Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), and Akron v. Akron Center for Reproductive Health, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), and Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
[5] Justice Overton has voted numerous times to overrule or recede from constitutional precedent without stating any "special reasons" to do so. See, e.g., Fine v. Firestone, 448 So.2d 984 (Fla. 1984) (Justice Overton's opinion receding from majority's constitutional interpretation he had joined in Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978), and distinguishing between constitutional single-subject limitations for legislative enactments and constitutional initiative process; receding from Floridians even though constitution had not changed and there were no "special reasons" to overrule beyond disagreement with precedent); School Board v. Price, 362 So.2d 1337, 1339 (Fla. 1978) (joining majority in receding from constitutional interpretation in School Board v. Surette, 281 So.2d 481 (Fla. 1973), and holding that legislative proviso conditioning waiver of sovereign immunity by prohibiting parties from attempting to prove insurance coverage at trial is not unconstitutional invasion of Court's rulemaking authority); Florida Greyhound Owners & Breeders Ass'n, Inc. v. West Flagler Assocs., Ltd., 347 So.2d 408, 412 (Fla. 1977) (Overton, J., concurring specially) ("the time has come to recede from Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965)," which held that "direct conflict" provision of article V of the Florida Constitution gave this Court jurisdiction to review district court decisions rendered without written opinions).

Other examples abound in cases where the Florida Constitution is not directly in issue. See, e.g., Brackin v. Boles, 452 So.2d 540, 542 (Fla. 1984) (Justice Overton's opinion holding that results of blood alcohol tests may not be excluded in civil trials under statute regardless of whether test was made for accident report investigation or criminal investigation, and receding from State v. Mitchell, 245 So.2d 618 (Fla. 1971), and State v. Coffey, 212 So.2d 632 (Fla. 1968) despite no relevant change in controlling statutory or constitutional law); Patterson v. State, 513 So.2d 1257, 1263 (Fla. 1987) (concurring in receding from Hardwick v. State, 461 So.2d 79 (Fla. 1984), cert. denied, 471 U.S. 1120, 105 S.Ct. 2369, 86 L.Ed.2d 267 (1985), based on Wasko v. State, 505 So.2d 1314 (Fla. 1987), and holding that contemporaneous conviction of attempted sexual battery upon a murder victim cannot constitute the statutory aggravating circumstance of prior conviction of a violent felony in capital cases, even though the issue was not raised on appeal); Makemson v. Martin County, 491 So.2d 1109, 1114 (Fla. 1986) (concurring with majority in receding from Metropolitan Dade County v. Bridges, 402 So.2d 411 (Fla. 1981), and holding that court-appointed attorney's fee statute is directory rather than mandatory), cert. denied, 479 U.S. 1043, 107 S.Ct. 908, 93 L.Ed.2d 857 (1987); Rosenberg v. Levin, 409 So.2d 1016 (Fla. 1982) (on rehearing) (writing majority opinion receding from Goodkind v. Wolkowsky, 132 Fla. 63, 180 So. 538 (1938), and holding that lawyer discharged without cause is entitled to reasonable value of services based on quantum meruit, but limited to the maximum fee set in the contract); Stephen Bodzo Realty, Inc. v. Willits Int'l Corp., 428 So.2d 225, 227 (Fla. 1983) (concurring with majority to reverse common-law rule of Penza v. Neckles, 344 So.2d 1282 (Fla. 1977), and holding that release of one joint and several obligor does not discharge liability of any and all other obligors); DeMarco v. Publix Super Markets, Inc., 384 So.2d 1253, 1255 (Fla. 1980) (Overton, J., dissenting) (arguing that Court should recede from Kirkpatrick v. Parker, 136 Fla. 689, 187 So. 620 (1939) and recognize a cause of action for wrongful discharge where such discharge interferes with an employee's access to the courts); Dober v. Worrell, 401 So.2d 1322, 1324 (Fla. 1981) (writing majority opinion receding from Gold Coast Crane Serv., Inc. v. Watier, 257 So.2d 249 (Fla. 1971), and holding that failure to raise affirmative defense before trial court considers motion for summary judgment precludes raising that issue for the first time on appeal).
[6] As Justice Kogan persuasively points out, overruling Bernie actually would maintain rather than erode the Fourth Amendment jurisprudence that Florida voters chose to adopt in 1982.
[7] In California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the federal Court ruled that a Fourth Amendment seizure takes place only on application of physical force, however slight, or submission to an officer's show of authority, and thus evidence discarded by a suspect who flees on an officer's show of authority is not embraced within the Fourth Amendment's protections, since no seizure has taken place.
[8] Under the majority ruling in Bernie v. State, 524 So.2d 988 (Fla. 1988), the Florida Court has designated the federal Court as the prime protector of certain fundamental rights of Florida citizens at the very moment in history that the federal Court in its opinions is abrogating that role and is deferring to state courts as the ultimate guarantors of their citizens' basic rights.
[9] See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (Fourth Amendment protects "wherever an individual may harbor a reasonable `expectation of privacy'").
[10] See Terry, 392 U.S. at 9, 88 S.Ct. at 1873 (1968) (comparable rule under Fourth Amendment).
[11] Cf. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (comparable rule under Fourth Amendment).
[12] Cf. id. at 498, 103 S.Ct. at 1324 (comparable rule under Fourth Amendment).
[13] Cf. id. (Under Fourth Amendment, a citizen "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.").
[14] See Terry, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred."). This Terry standard was recently modified in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), wherein the Court ruled that a Fourth Amendment seizure takes place only on application of physical force or submission to an officer's show of authority. The Florida Court, however, is tied to federal Court precedent preceding November 1982, including Terry and its traditional standard. I note that the novel position adopted by the federal Court in Hodari had been rejected by that Court three years earlier in Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). See also 3 Wayne R. LaFave, Search and Seizure, § 9.2, at 61 (2d ed. Supp. 1991).
[15] The restraint on one's liberty must be significant; it obviously must rise above the moral or instinctive urge to cooperate that one ordinarily experiences when approached by a police officer.
[16] See United States v. Mendenhall, 446 U.S. 544, 454, 100 S.Ct. 1870, 1778, 64 L.Ed.2d 497 (1980) ("We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). Accord Chesternut, 486 U.S. at 573, 108 S.Ct. at 1979; I.N.S. v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); Royer, 460 U.S. at 502, 103 S.Ct. at 1327. Cf. Florida v. Bostick, ___ U.S. ___, ___, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) ("the appropriate inquiry is whether a reasonable person would feel free to decline the officers requests or otherwise terminate the encounter").
[17] See Terry, 392 U.S. at 21-27, 88 S.Ct. at 1879-83 (comparable analysis under Fourth Amendment).
[18] Factors to be considered include whether the evidence was obtained as a product of the defendant's free will, the temporal proximity of the illegality to the discovery of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975).
[19] See 1 LaFave, supra note 8, § 2.6(b), at 472 n. 62 (2d ed. 1987), wherein Professor LaFave rejects the reasoning in State v. Oliver, 368 So.2d 1331 (Fla. 3d DCA 1979), cert. dismissed, 383 So.2d 1200 (Fla. 1980), that only an illegal search, not a prior illegal seizure, can render a subsequent abandonment involuntary:

The Oliver reasoning is not convincing. The question is not whether, but for the throwing away of the objects, the police would have found them in an illegal search. Rather, the question is whether the prior illegality has promoted the disposal, which it most assuredly did. Oliver is an invitation to police to engage in illegal stops.
Professor LaFave states the preferred rule as follows:
Property is not considered abandoned when a person throws away incriminating articles due to the unlawful activities of police officers. Thus, where a person has disposed of property in response to a police effort to make an illegal arrest or illegal search, courts have not hesitated to hold that property inadmissible.
1 LaFave, supra, at 471-72 (2d ed. 1987) (footnotes and quotation marks omitted). The Oliver reasoning is plainly inconsistent with section 12's exclusionary provision, which is intended to discourage lawless police activity. See Terry, 392 U.S. at 12, 88 S.Ct. at 1875 ("Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct."). Professor LaFave states the obvious:
Incriminating admissions and attempts to dispose of incriminating evidence are common and predictable consequences of illegal arrests and searches, and thus to admit such evidence would encourage such Fourth Amendment violations in future cases.
4 LaFave, supra, § 11.4(j), at 459-60 (2d ed. 1987). See also United States v. Beck, 602 F.2d 726 (5th Cir.1979).
[20] At the very least the United States Supreme Court is approaching the question of stare decisis on an inconsistent, ad hoc basis. That fact alone shows how feeble and weak-kneed a concept the federal doctrine has become.
[21] For this reason alone, I now believe that a constitutional amendment cannot lawfully purport to limit the scope of constitutional rights based upon future events occurring in some jurisdiction other than Florida. What the Bernie opinion held is no less absurd than finding that the Florida Constitution must be construed in conformity with the Alaska Supreme Court's views of its own constitution, even though Alaska is a state with vastly different problems than Florida. Similarly, the United States Supreme Court is not, and cannot be, concerned with the unique problems of Florida  only with establishing a national minimum standard of constitutional rights that will be as meaningful for Florida as for Alaska and every other American jurisdiction. A very good discussion of this point is made in Heitman v. State, 815 S.W.2d 681 (Tex. Crim. App. 1991).